# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
No. 14-318V
Filed: March 31, 2016

```
* * * * * * * * * * * * * * * *
EMILY CULLIGAN,                    *    TO BE PUBLISHED
                                   *
                   Petitioner,     *    Special Master Hamilton-Fieldman
v.                                 *
                                   *
SECRETARY OF HEALTH                *    Attorney Hourly Rate; Attorney Hours;
AND HUMAN SERVICES,                *    Expert Hourly Rate; Expert Hours; Interim
                                   *    Attorneys' Fees and Costs.
                   Respondent.     *
* * * * * * * * * * * * * * * *
```

Mark Krueger, Krueger & Hernandez, SC, Baraboo, WI, for Petitioner.
Lara Englund, United States Department of Justice, Washington, DC, for Respondent.


## DECISION AWARDING INTERIM ATTORNEYS' FEES AND COSTS[1]

On November 4, 2015, Emily Culligan ("Petitioner") filed a motion for an interim award of attorneys' fees and costs pursuant to 42 U.S.C. § 300aa-15(e).[2] After careful consideration, the undersigned grants the request in part.

---

[1] The undersigned intends to post this Decision Awarding Interim Attorneys' Fees and Costs on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, codified as amended at 44 U.S.C. § 3501 note (2012). As provided by Vaccine Rule 18(b), each party has 14 days within which to file a motion for redaction "of any information furnished by that party (1) that is trade secret or commercial or financial information and is privileged or confidential, or (2) that are medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).

[2] The applicable statutory provisions defining the Vaccine Program ("the Program") are found at 42 U.S.C. § 300aa-10 et seq. (2012). Hereinafter, for ease of citation, all § references will be to 42 U.S.C. (2012).

## I.    PROCEDURAL BACKGROUND

On April 18, 2014, Petitioner filed a Petition alleging that Human Papillomavirus vaccinations ("Gardasil" or "HPV vaccines") on March 31, 2010, June 1, 2010, and October 4, 2010 caused her to suffer from premature ovarian failure ("POF").  Petition ("Pet") at 1-2.  Petitioner was, and continues to be, represented by Mark Krueger of the Krueger and Hernandez law firm.  Pet. at 2.  The case was initially assigned to Special Master Christian Moran.  Notice of Assignment, April 18, 2014.

Petitioner filed seven medical record exhibits between May 20 and July 21, 2014; in the interim, the case, along with several others filed by petitioners who had alleged similar injuries caused by Gardasil, was reassigned to the undersigned.  *See* Notice of Reassignment, filed June 17, 2014.  Petitioner filed a statement of completion on July 30, 2014.

On August 14, 2014, Respondent filed a Rule 4(c) Report and Motion to Dismiss ("Respondent's Report") in which she contended that Petitioner was not entitled to a Program award.  Respondent argued that the first symptom of Petitioner's POF was oligomenorrhea,[3] which Petitioner experienced in "late 2010;" accordingly, Petitioner's claim was untimely under 42 U.S.C. § 300aa-16(a)(2) (requiring that petitions be filed prior to "the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset … of injury") [hereinafter "the statute of limitations"].  Respondent's Report at 4.  Respondent also argued that, even if Petitioner's claim was not time-barred, Petitioner had failed to prove causation under *Althen v. Secretary of Health and Human Services*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  Respondent's Report at 4-5.

At a status conference held on September 23, 2014, the undersigned discussed with the parties the necessity of establishing an onset date in the instant case – and in the other cases in which Mr. Krueger had alleged that petitioners' POF had been caused by Gardasil vaccinations – in order to assess the timeliness of those cases under the statute of limitations.  *See* Order, filed Sept. 25, 2014, at 1.  The undersigned directed Petitioner to begin the process of identifying all of the POF petitioners so that an assessment of onset could take place in all of those cases.  *Id*.

On October 1, 2014, Petitioner filed a status report in which she identified eight POF cases to be included in the undersigned's assessment of onset.[4]  *See* Petitioner's Status Report,

---

[3] Oligomenorrhea is defined as "menstrual flow happening less often than normal, defined as at intervals of 35 days to 6 months; called also *infrequent menstruation*."  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*"), 1318 (32nd ed. 2012) (emphasis in orginal).

[4] The cases identified were *Alexander*, 14-868V; *Culligan*, 14-318V; *Fishkis*, 14-527V; *Lee*, 14-258V; *Lydia McSherry*, 14-154V; *Meghan McSherry*, 14-153V; *Stone*, 13-289V; and *Tilley*, 14-818V.

filed Oct. 1, 2014, at 1.  Petitioner subsequently named the instant case – *Culligan*, 14-318V – as the onset "test case."  *See* Petitioner's Status Report, filed Nov. 5, 2014, at 1.

A third status conference was held on November 20, 2014, during which the parties agreed that, "in all pending [POF] cases … an expert hearing [would] be held to address the question of what constitutes 'the first symptom or manifestation of [POI[5]/POF] onset recognized as such by the medical profession at large.'"  Order, filed Nov. 24, 2014, at 1 (citing *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1340 (Fed. Cir. 2011)).  The undersigned explained that an onset determination would be made on the basis of the evidence presented at the *Culligan* onset hearing; similar hearings would *not* be conducted in the other POF cases, all of which would trail *Culligan* for purposes of an onset determination.  *See* Order, filed Nov. 24, 2014, at 1.  The undersigned also added four additional POF cases[6] to the list of cases set to trail *Culligan*.  *Id.*

The parties and the undersigned proceeded to identify questions for the experts, to be researched and answered before the hearing, regarding the nature and timing of onset in the POF cases.  *See, e.g.*, Respondent's Status Report, filed Oct. 28, 2014, at 1; Order, filed Nov. 24, 2014, at 2; Petitioner's Status Report, filed Dec. 29, 2014, at 1; Order, filed Jan. 30, 2015, at 1; Order, filed Feb. 18, 2015, at 1.  The parties and their experts ultimately agreed that, except in *Culligan*, in which the entire medical record would be considered by the experts, the experts would "offer opinions regarding the onset issues in the trailing cases by considering the facts of those cases as hypotheticals."  Joint Status Report, filed Jan. 20, 2015, at 1.  To facilitate this process, Petitioner filed summaries of the facts of all twelve POF cases.  *See* Petitioner's Exhibit ("Pet. Ex.") 9 (summarizing the facts of the twelve POF cases).[7]  Except in *Culligan*, the experts were to rely on the factual summaries, in lieu of the medical records themselves, to articulate their opinions regarding onset.  *See* Joint Status Report, filed Jan. 20, 2015, at 1.

---

[5] "POI" refers to primary ovarian insufficiency, which is defined as "a condition in which a woman is running low on her egg supply or is completely out of eggs before the age of 40 …. POI associated with lack of menstrual cycles has been more commonly called Premature Ovarian Failure (POF).  However, many experts now believe that POI is a more accurate term because in many cases the ovary has not completely 'failed' and instead may still function to produce hormones or release eggs."  Stanford Children's Health website; http://www.stanfordchildrens.org/en/service/fertility-and-reproductive-health/primary-ovarian-insufficiency (last visited Jan. 6, 2016).

[6] The four added cases were *Olivia Meylor*, 10-771V; *Madelyne Meylor*, 10-770V; *Bello*, 13-349V; and *Chenowith*, 14-996V.  The petitioners in the *Meylor* cases, *Bello*, and *Chenowith* are all represented by Mr. Krueger.

[7] A factual summary for the 13th trailing POF case – *Smith*, 14-1107V – was also filed in *Culligan*.  Order, filed Feb. 23, 2015, at 2-3; *see also* Order, filed Jan. 26, 2015; Order, filed Jan. 30, 2015, at 1-2.  The petitioner in *Smith* was represented by different counsel.

At a status conference held on January 28, 2015, the undersigned set deadlines for the parties' expert reports regarding onset. *See* Order, filed Jan. 30, 2015, at 2. The experts were directed to address all of the identified onset questions separately, "on a question-by-question basis." *Id.* at 1.

On February 19 and March 3, 2015, three additional cases[8], all filed by Mr. Krueger, were added to the list of POF trailing cases. *See* Order, filed Feb. 19, 2015, at 1; Order, filed Mar. 3, 2015, at 1. Mr. Krueger subsequently filed in *Culligan* factual summaries of the three new cases. *See* Pet. Exs. 10, 11, 12.

On March 12, April 29, and June 1, 2015, Petitioner filed expert reports and supporting medical literature, all of which were purportedly limited to the issue of onset. Pet. Ex. 13, tabs 1-11; Pet. Ex. 17, tabs 1-44; Pet. Ex. 15, tabs 1-11.[9] The expert reports were authored by Dr. Felice Gersh and Dr. Orit Pinhas-Hamiel. The reports filed by Dr. Gersh and Dr. Hamiel reflected that they had reviewed the medical records underlying all of the POF cases. *See generally* Pet. Exs. 13, 15.

The undersigned convened a status conference on April 1, 2015, after having reviewed Petitioner's expert reports. *See* Order, filed April 2, 2015, at 1. The undersigned noted that, "notwithstanding the fact that Petitioner's onset experts have now reviewed the medical records associated with every POF/ POI case, Respondent's onset expert(s) will review only the cases' factual summaries, the *Culligan* record, and Respondent's list of hypothetical questions." *Id.* Also, having expressed some concern about the extent to which Petitioner's expert reports reflected an understanding of the relevant question regarding onset, the undersigned reiterated "that the relevant date, for purposes of assessing onset under *Cloer* [citation omitted], is *not* the first point in time at which a definitive diagnosis could have been made; rather, it is the time at which the first symptom or manifestation of the allegedly vaccine-caused injury occurred." *Id.* (emphasis in original). "The onset experts must make this assessment with the benefit of hindsight, rather than placing themselves in the shoes of the treating, diagnosing physicians. The parties are directed to address this issue as specifically as possible in their pre-hearing briefs." *Id.*

Respondent filed an expert report regarding onset, as well as relevant medical literature, on May 8, May 28, and June 1, 2015. Respondent's Exhibit ("Resp. Ex.") A; Resp. Ex. A tabs 1-32. Respondent's expert report was authored by Dr. David Frankfurter.

---

[8] The cases were *Vakalis*, 15-134V; *Garner*, 15-143V; and *Brayboy*, 15-183V.

[9] Petitioner also filed abstracts of medical literature referenced by Dr. Gersh at the onset hearing. Petitioner's Exhibit 17, tabs 45-65, were filed on June 29, 2015.

At a status conference held on May 14, 2015, Respondent confirmed that, in preparing his expert report, Dr. Frankfurter had reviewed only the factual summaries submitted by Petitioner (and the medical record from *Culligan*). *See* Order, filed May 15, 2015, at 1. Mr. Krueger agreed that, notwithstanding the fact that his experts had reviewed all of the medical records of all of the POF cases, "his experts would be referring to the factual summaries rather than to the medical records themselves" at the onset hearing. *Id*.

The parties filed their pre-hearing briefs simultaneously on June 1, 2015, and an onset hearing took place on June 16 and 17, 2015. Petitioner's experts, Dr. Gersh and Dr. Hamiel, and Respondent's expert, Dr. Frankfurter, testified. Transcript ("Tr.") 4, 255.

On July 1, 2015, the undersigned issued an Order identifying nine POF cases[10] "as presumptively precluded under the applicable statute of limitations." Order, filed July 1, 2015, at 1. *Culligan* was included among the presumptively precluded cases. *Id*. The undersigned also identified six cases[11] that appeared to have been timely filed. *Id*. Having apprised the parties of these preliminary conclusions, the undersigned granted them additional time to file status reports identifying the cases in which they intended to contest this determination and explaining what they had identified as the onset symptom in each case. *Id*. at 2.

On August 28, 2015, Respondent filed a status report in which she stated that she did not intend to contest the undersigned's preliminary findings in any of the presumptively timely cases filed by Mr. Krueger. Status Report, filed Aug. 28, 2015, at 1. In status reports filed on September 2 and 30, 2015, Petitioner argued that all of the preliminarily precluded cases were, in fact, timely.

At a status conference held on October 13, 2015, the undersigned "informed the parties that, for purposes of an onset determination, the POF/POI cases [would] be divided into two groups: [1,] petitioners who never menstruated … and [2,] the rest of the POF/ POI petitioners." *See* Order, filed Oct. 14, 2015, at 1.

On November 4, 2015, Petitioner filed an interim attorneys' fees and costs motion [hereinafter "Motion"]. In her motion, which was filed only in *Culligan*, Petitioner requests

---

[10] The following cases were identified as presumptively untimely: *Culligan*, 14-318V; *Chenowith* (formerly *Nunez*), 14-996V; *Fishkis*, 14-527V; *Garner*, 15-143V; *Lee*, 14-258V; *Lydia McSherry*, 14-154V; *Meghan McSherry*, 14-153V; *Madelyne Meylor*, 10-770V; and *Stone*, 13-289V.

[11] The following cases were identified as presumptively timely: *Alexander*, 14-868V; *Bello*, 13-349V; *Brayboy*, 15-183V; *Olivia Meylor*, 10-771V; and *Vakalis*, 15-134V. The undersigned also identified as timely *Smith*, 14-1107V, a trailing POF case that had been filed by a different attorney. *See supra* note 7. In *Tilley*, 14-818V, the undersigned directed the parties to file additional briefs regarding onset.

interim compensation for the attorneys' fees and costs incurred in all fourteen POF/ POI cases in which Mr. Krueger represents the petitioner.  Motion at 5-9.  In total, Petitioner requests compensation for attorneys' fees in the amount of $223,417.50, attorneys' costs in the amount of $28,072.07, clients' costs in the amount of $10,305.42,[12] and experts' fees and costs in the amount of $116,656.29.  *Id*. at 8.  In *Culligan* alone, she requests compensation for attorneys' fees in the amount of $74,892.50, attorneys' costs in the amount of $9,026.66; expert costs for Dr. Hamiel in the amount of $34,090.00, and expert costs for Dr. Gersh in the amount of $68,341.29.[13]  *Id*.

The undersigned convened a status conference on November 17, 2015 to discuss how to proceed on Petitioner's Motion.  *See* Order, filed Nov. 20, 2015, at 1.  During the status conference, Respondent indicated that, "because Respondent's bases for objection vary from case to case, they intend to file separate responses to Mr. Krueger's motion" in each POF case. *Id*.  The undersigned agreed that the interim fees applications would have to be analyzed separately in each trailing case.  *Id*.  Moreover, the undersigned noted that, in some of the trailing cases, the interim fees motions would not be ripe until an onset decision had been made: "[t]o the extent that reasonable basis is at issue in these cases, the undersigned [would not be] rul[ing] on Mr. Krueger's interim fee requests until after factual findings regarding onset have been made." *Id*.  The undersigned informed the parties that a separate ruling on the interim fees and costs requested in *Culligan* would be issued first, followed by rulings on interim fees and costs in all of the trailing POF cases that are unlikely to be time-barred.[14]  *Id*.  Although *Culligan* had been included on the undersigned's July 1, 2015 list of presumptively untimely cases, Respondent assured the undersigned that she did not intend to raise a reasonable basis objection in that case. *Id*.

On December 14, 2015, Respondent filed an Opposition to Petitioner's Motion [hereinafter "Response"].  In her Response, Respondent objects to the hourly rate and number of hours billed by Mr. Krueger's associate, Andrew Krueger; to the hours billed for preparing the interim fees request, which Respondent characterized as "overhead;" to the travel costs incurred by an unidentified third person for travel to Washington, D.C., for the onset hearing; to the hours billed by Petitioner's experts in reviewing medical records in all thirteen cases; to inadequate documentation in the experts' billing records; to the costs Dr. Hamiel incurred travelling from

---

[12] Mr. Krueger requested, and Respondent did not object, to separate reimbursement of all the costs personally incurred by the petitioners who traveled to Washington, D.C. to attend the onset hearing. These decisions have already been issued in the relevant trailing cases.

[13] Mr. Krueger represents that Ms. Culligan did not personally incur any costs in pursuit of her Vaccine claim.  Motion at 8.  The undersigned does not read General Order No. 9, which requires petitioners to file signed statements regarding personally-incurred costs before counsel can be eligible to receive compensation, to apply to interim fee applications.

[14] *See supra* note 11 (list of the presumptively timely cases).

Tel Aviv, Israel, to Washington, DC, for the onset hearing; to Dr. Gersh's rates, which Respondent characterizes as excessive; and to Dr. Gersh's hours, which Respondent argues were both excessive and inadequately documented, especially in light of the fact that her report "was largely irrelevant and her testimony was not useful in deciding the issues before the Court." Response at 4-7.  Respondent does not object to Petitioner's requested rates of $300.00 per hour for attorney Mark Krueger and $125.00 per hour for paralegal Renee Nehring.  *Id*. at 3, n. 2.

Petitioner filed a Reply to Respondent's Response on December 30, 2015 [hereinafter "Reply"].  In her Reply, she defends the fees incurred by Andrew Krueger, the hours billed preparing the initial application for interim fees and costs, the reasonableness of her claimed travel costs (minus one of three plane tickets), and the costs incurred by Dr. Hamiel and Dr. Gersh.  Reply at 2-3.  Petitioner also argues, more generally, that Respondent's level of scrutiny is contrary to "the Vaccine Act's intention of creating a non-adversarial" recourse for vaccine-injured petitioners, and that such scrutiny "will ultimately hinder future Petitioners from being able to find competent counsel and experts."  *Id*. at 4.[15]

Petitioner's motion - as it applies to fees and costs incurred in *Culligan* only – is now ripe for a ruling.

## II.   ANALYSIS

### A.  Applicable Legal Standard

Petitioner is eligible for an award of reasonable attorneys' fees and costs if the undersigned finds that she filed her petition in good faith and with a reasonable basis.  § 300aa-15(e)(1); *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008).  Reasonable attorneys' fees are determined by "'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).  Special masters have "wide discretion in determining the reasonableness" of attorneys' fees and costs, *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994), and may increase or reduce the fee award based on specific findings.  *Avera*, 515 F.3d at 1348.

In making reductions, a line-by-line evaluation of the fee application is not required.  *Wasson*, 24 Cl. Ct. at 483-84.  Special masters may rely on their experience with the Vaccine Act and its attorneys to determine the reasonable number of hours expended.  *Id*. at 485.  Just as

---

[15] Petitioner also filed affidavits authored by her counsel, Mark and Andrew Krueger, as well as documentation related to their firm's costs.  *See* Addendum to Reply ("Reply Addendum"); Reply Addendum Tab 1 at 3-18.

"[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests . . . [v]accine program special masters are also entitled to use their prior experience in reviewing fee applications." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (citations omitted).

In *Avera,* the Federal Circuit held that "[i]nterim fees are particularly appropriate in cases where proceedings are protracted and costly experts must be retained." 515 F.3d at 1352.  In *Shaw,* the Federal Circuit held that "[w]here the claimant establishes that the cost of litigation has imposed an undue hardship and that there exists a good faith basis for the claim, it is proper for the special master to award interim attorneys' fees." 609 F.3d at 1375.  Applying these standards, the undersigned finds that an award of interim attorneys' fees and costs is reasonable and appropriate in this case.

### B.  Hours Billed by Attorney Andrew Krueger

Respondent objects to reimbursement for 44.5 hours of time billed by attorney Andrew Krueger, 25.5 hours of which were incurred during the onset hearing and 19.0 of which were billed as travel time.  Response at 4; Addendum to Interim Fees Motion [hereinafter "Motion Addendum"], Affidavit of Mark Krueger, at 116.  Andrew Krueger bills at $200.00 per hour for his work.  *See* Reply Addendum, Affidavit of Andrew Krueger, at 1.  Respondent argues that Petitioner should not be compensated for the hours billed by Andrew Krueger because he "had not billed any time to the case until June 15, 2015, and did not participate at the hearing." Response at 4.  "To the extent that this was a training opportunity for a junior attorney," Respondent argues, "it is not compensable." *Id*.  Noting that he performed tasks such as "'organizing articles and notes' [and] 'preparing documents,'" Respondent argues that, at most, he should be compensated at a paralegal rate.  *Id*. (brackets omitted).

In his Reply, Petitioner points out that, had Andrew Krueger not been present at the hearing, Mark Krueger would have had to perform these tasks at a higher hourly rate.  Reply at 2.  Petitioner argues that "[h]aving two attorneys present [at hearing] was necessary in order to meet and coordinate with both experts and clients[, to] … prepare the witnesses …. locat[e] exhibits, coordinat[e] questions from Petitioner's experts, [and] coordinat[e] notes and questions as testimony proceeded." *Id.*

Based on the explanations contained in Petitioner's reply and affidavits, the undersigned finds that the hours billed by Andrew Krueger, as well as his hourly rate, were reasonable.  In light of the complexity of these cases, it is not surprising that Mark Krueger would require assistance from another attorney (indeed, Respondent was represented by two attorneys at the onset hearing), and Andrew Krueger's hourly rate is not excessive.  Petitioner's Motion is GRANTED as to all fees incurred by Andrew Krueger.

### C.  Hours Billed for Preparing the Interim Fees Request

Petitioner requests reimbursement for 18.1 attorney hours and 8.2 paralegal hours[16] spent preparing the interim fees request that is the subject of this decision.  Motion Addendum at 115-16.  The total amount incurred in preparing the interim fees application, not including any time spent on Petitioner's Reply, is $6,455.00.[17]  *Id.*  Respondent argues that the reasonableness of counsel's fees should be assessed with reference to the perspective of a paying client, that these fees are part of "overhead," and that "no reasonable client would pay for her counsel to assemble an invoice."  Response at 4 (citing *Amar v. Sec'y of Health & Human Servs.*, No. 06-221V, 2011 WL 6077558, at *7 (Fed. Cl. Spec. Mstr. Nov. 10, 2011); *Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201 (2009)).

In her Reply, Petitioner argues that "[t]he Vaccine Court has routinely approved fee requests for the time spent drafting an application for attorneys' fees, as long as the request meets the standards set for [sic] in the Vaccine Act."  Reply at 2.  Petitioner points out that the hours billed are "really for fifteen different cases, meaning a little over one hour per case."  *Id.*  Petitioner also argues that "[a] reasonable client would surely pay his or her attorney to draft legal documents to file with the court in order to reimburse themselves for costs they incurred while navigating through the Vaccine Program."  *Id.*

The undersigned finds that Petitioner is entitled to compensation for a reasonable amount of time spent preparing the interim fees application.  *See Brown v. Sec'y of Health & Human Servs.*, No. 09-426V, 2012 WL 952268, at *7 (Fed. Cl. Spec. Mstr. Feb. 29, 2012) (holding that "[a] reasonable amount of time to prepare [an interim] fee application is two days or 16 hours", and compensating counsel for 16 of the 31.3 hours that were expended in preparing the interim fees application).

The undersigned also finds that it was reasonable for Petitioner to incur 18.1 hours of attorney time and 8.2 hours of paralegal time, especially in light of the number of cases that were associated with *Culligan* for purposes of an assessment of onset.[18]  Petitioner's motion is GRANTED as to all hours billed for preparation of Petitioner's interim fees application.

---

[16] According to Respondent, Petitioner billed 7.9 paralegal hours to prepare the interim fees request.  Response at 4.  The undersigned counts 8.2 hours.  Motion Addendum at 115-16.

[17] 18.1 hours at $300.00 per hour ($5,430.00) + 8.2 hours at $125.00 per hour ($1,025.00) = $6,455.00.

[18] Although Respondent does not contest reasonable basis in *Culligan*, she has reserved the right to contest reasonable basis in the other pending POF cases.  *See* Order, filed Nov. 20, 2015, at 1.  Accordingly, the undersigned has deferred ruling on Mr. Krueger's pending interim fees applications in several of those cases.  *Id.*  Notwithstanding the fact that several of the interim fees applications are not

### D.  Counsel's Travel Costs

Petitioner seeks reimbursement for $1,626.40 incurred in traveling to Washington, DC from Milwaukee, Wisconsin, for the onset hearing,[19] and $5,115.21 for three hotel rooms, parking, travel, and meals.  Motion Addendum, Affidavit of Mark Krueger, at 118-19; Reply Addendum, Affidavit of Mark Krueger, at 4-18.  Respondent initially objected to the fact that Petitioner had not filed any receipts for these travel costs.  Response at 4-5.

After Respondent filed her Response, Petitioner filed receipts for the hotel rooms,[20] airfare, and other travel expenses.  *See generally* Reply Addendum, Affidavit of Mark Krueger. The undersigned has reviewed these receipts and now finds that the documented costs were reasonably incurred.  Petitioner's motion is GRANTED as to all of counsel's travel costs, minus the cost of one flight.  *See supra* note 19.

### E.  Dr. Hamiel's Costs

Petitioner seeks reimbursement for $34,090.00[21] in fees and costs incurred by Dr. Hamiel.  Motion at 8; Motion Addendum at 1-4 ("Dr. Hamiel's Statement").  Dr. Hamiel

---

yet ripe, the undersigned has determined that fees and costs related to those cases are immediately compensable to the extent that they were incurred for purposes of an assessment of onset.  The undersigned's purpose in consolidating the POF cases was to facilitate a global analysis of a novel question regarding onset; Petitioner's counsel should not now be penalized for work performed in compliance with the Court's orders.

[19] Petitioner initially sought $2,439.60 in airfare costs for three flights to and from the onset hearing. Motion Addendum at 118-19.  Petitioner subsequently clarified that this figure "include[s] one additional plane ticket that should not have been included."  Reply at 2.  Accordingly, the total amount requested by Petitioner for airfare is $1,626.40 (including two flights at $813.20 each).  Reply Addendum at 8-18.

[20] The undersigned notes that two of these hotel rooms were paid for by Petitioner's counsel for the use of his experts, Dr. Gersh and Dr. Hamiel.  Reply Addendum, Affidavit of Mark Krueger, at 6-7.  These costs are reimbursed as an element of counsel's expenses rather than Sections (2)(E) and (2)(F), *infra*.

[21] The costs listed in Dr. Hamiel's affidavit do not add up to the figure listed in Petitioner's motion ($34,090.00).  As an initial matter, Dr. Hamiel's affidavit is internally inconsistent regarding the number of hours she spent preparing for the onset hearing: the body of her affidavit reflects that she billed 70 hours at $400 per hour, but her final invoice documents that she spent only 68 hours at $400 per hour (52 hours of preparation + 16 hours of testimony).  Motion Addendum, Dr. Hamiel's Statement at 2, 3. Moreover, Dr. Hamiel included in her invoice 6 hours spent "reviewing the medical records of Cristal Bello, and preparing a report that was filed [in that case only]."  If Dr. Hamiel did, in fact, intend to bill for 68 hours of preparation, Petitioner would be entitled to compensation for $27,200 in fees for hours billed at her full rate (68 hours at $400 per hour) – $2,400 (6 hours spent on Bello, which is not compensable in this case, at $400 per hour) + $8,000 (40 hours of travel at $200 per hour) + $1,290 in

charged an hourly rate of $400.00 for reviewing medical records in the thirteen cases provided to her, conducting medical and scientific research, consulting with Petitioner's counsel, preparing her expert reports, reviewing Dr. Frankfurter's report and medical literature, and testifying at the onset hearing.  Dr. Hamiel's Statement at 1-2.  In total, she spent 68 hours on these tasks; 46 hours[22] appear to have been spent preparing for the onset hearing.  *Id*. at 2-3.  She also spent 40 hours, at $200 per hour (half of her hourly rate), traveling to and from the onset hearing from her home in Tel Aviv, Israel.  *Id*. at 2-4.  Requested reimbursement for all incidental costs associated with her travel has already been approved.  *See* Section (II)(D), *supra*; Dr. Hamiel's Statement at 1 ("Expenses associated with my travel from the airport and meals are not included.").

Respondent objects to compensating Petitioner for several of the costs incurred by Dr. Hamiel.  She objects to the lack of detail in Dr. Hamiel's affidavit, which does not indicate how many hours were worked each day, "break down the time between the different tasks performed," or bill in increments greater or less than one hour.  Response at 5.  Respondent also argues that "time spent reviewing the records in cases other than *Culligan* was unnecessary and excessive:" the experts were specifically instructed to "consider the facts of the [trailing] cases as hypotheticals precisely to avoid the time and expense involved in reviewing all of the medical records."  *Id*.; *see also* Joint Status Report, filed January 20, 2015, at 1.  Finally, Respondent objects to compensating Petitioner for the expense incurred in flying Dr. Hamiel to Washington for the onset hearing.  *Id*. at 5-6.  Respondent points out that Petitioner has offered no reason that she could not have retained an expert in the United States, that "Dr. Hamiel has no particular expertise in POF," that she has not published on the subject, and that "she has treated 'very few' people with the condition."  *Id*., Tr. 27.

In her Reply, Petitioner argues that the number of hours expended by Dr. Hamiel was "reasonable and necessary" in light of the number of cases Dr. Hamiel was required to review.  Reply at 2-3.  Petitioner argues that, "while *Culligan* was the lead case, time spent reviewing records in the other cases was necessary, and proved to be beneficial given that Dr. Hamiel was able to answer questions that Respondent's expert was not."  *Id*. at 3.  Finally, Petitioner points out that Dr. Hamiel testified regarding causation in the *Meylor* cases – two POF cases that now trail *Culligan* for purposes of an onset assessment – and that she was compensated for her fees and costs, to which Respondent did not object.  *Id*.

---

flight expenses, for a total of $34,090 in fees and costs.  The cost of Dr. Hamiel's other expenses were included in counsel's travel costs.  *See* Section (II)(D), *supra*.

[22] Forty hours "reviewing the medical records of the 13 cases provided" (the undersigned assumes this also includes report preparation, review of relevant medical literature, and consultation with counsel) + 4 hours reviewing Dr. Frankfurter's report and medical literature and preparing a response + 2 hours discussing her anticipated testimony with Mr. Krueger prior to the hearing = 46 total pre-hearing hours. Dr. Hamiel's Statement at 1-2.

The undersigned finds that Dr. Hamiel's $400 hourly rate and her $200 travel rate, neither of which was contested by Respondent, are reasonable.  The undersigned also agrees with Petitioner that it was not unreasonable to retain an expert from Israel, and that Dr. Hamiel should be compensated for her travel costs.  *See, e.g.*, *Crutchfield v. Dep't of Health & Human Servs.*, No. 09-39V, 2011 WL 3806351, at *8-9 (Fed. Cl. Spec. Mstr. Aug. 4, 2011) (compensating an expert for his travel time to and from Israel at one half of his approved hourly rate of $350).

The undersigned agrees with Respondent, however, that the level of detail contained in Dr. Hamiel's billing entries is deficient.  The undersigned is unable to adequately assess the reasonableness of Dr. Hamiel's hours in the absence of documentation regarding the dates of the hours worked and the specific nature of the tasks performed.

The undersigned also agrees with Respondent that, to the extent that Dr. Hamiel spent time reviewing the medical records in cases other than *Culligan* – and, as noted above, it is difficult for the undersigned to determine how, exactly, Dr. Hamiel's hours were spent – she did so in contravention of the undersigned's prior orders.  On November 20, 2014, a status conference was held during which the undersigned explained that an expert hearing regarding onset would be held in *Culligan* only; accordingly, to conserve judicial resources and to expedite the process, the undersigned directed the parties to follow up with a status report "documenting whether they and their experts have agreed to opine on the facts of the trailing cases by reviewing the facts of those cases as hypotheticals."  Order, filed Nov. 24, 2014, at 1-2.  In the event that the parties did not wish to have the experts address the facts of the trailing cases via hypotheticals, they were directed to file a status report "stat[ing] how they would prefer to introduce these facts in to the record of the lead case."  *Id*. at 2.  On January 20, 2015, the parties filed a joint status report in which they confirmed that their experts had all "agreed to offer opinions regarding the onset issues in the trailing cases by considering the facts of those cases as hypotheticals."

Because the undersigned had issued orders explicitly directing the parties' experts *not* to review the medical records in the trailing POF cases, Petitioner's argument that "time spent reviewing records in the other cases was necessary … [and] beneficial" is unavailing.  *See* Reply at 3.  Accordingly, the undersigned will compensate Petitioner for 40 of the 46 hours[23] spent by

---

[23] *See* note 21, *supra* (breakdown of relevant hours).

Dr. Hamiel preparing for the onset hearing.[24]  This results in a deduction of $2,400 from the requested amount of $34,090.[25]

### F.  Dr. Gersh's Costs

Petitioner seeks reimbursement for $68,341.29 in fees and costs incurred by Dr. Gersh.[26] Motion at 8; Motion Addendum at 1-10 ("Dr. Gersh's Statement").  Dr. Gersh charged $500 per hour for time spent "review[ing] medical records, perform[ing] medical and scientific research, and perform[ing] other matters and provid[ing] reports and expert testimony."  Dr. Gersh's Statement at 1.  Dr. Gersh avers that she spent 88.5 hours at her regular rate for tasks that included "reviewing medical records, consulting with Petitioner's Counsel, researching articles for the June 2015 hearings, and preparing for the hearings."  *Id.* at 2, 5-6.  Although her Statement appears to reflect that she charged $500 per hour on all pre-hearing activities, her billing statement reflects that she charged $650 per hour on "report preparation."  *Compare* Dr. Gersh's Statement at 1-2 with Dr. Gersh's Statement at 5.  Dr. Gersh also charged a flat rate of $9,500 per day for each day of the 2-day hearing.  *Id.* at 2.  Of the 88.5 pre-hearing hours expended by Dr. Gersh, 45.5 hours were billed at $500 per hour ($22,750), 31 hours were billed at $650 per hour ($20,150), and 12 hours were billed for "[o]ther services by non-MD Staff" at $95 per hour ($1,140).  *Id.* at 5.  Including the $19,000 flat rate charged for two days of hearing, the total amount of the fees requested by Dr. Gersh is $63,040.00.  *Id.*

Dr. Gersh also requested reimbursement of $5,301.29 in costs, including an airline ticket ($358.60), meals ($142.69), and 16 hours of travel at a rate of $300 per hour ($4,800.00).  *Id.* at 2, 5-8.

Respondent objects to the total amount of fees and costs incurred by Dr. Gersh, and to her hourly rate, as "patently excessive."  Response at 6.  Respondent argues that "there is no precedent in this Program for such exorbitant rates," and that Petitioner has provided no justification for charging them.  *Id.*  Respondent also objects to the lack of specificity with which she accounted for her time, and identified as particularly incredible Dr. Gersh's assertion that she worked on "report preparation" for 20 hours on a single day (June 12, 2015).  Response at 5; *see*

---

[24] To the extent that Dr. Hamiel's medical record review is relevant to causation rather than onset, Dr. Hamiel's fees for performing that task may be compensable later.  In the event that Petitioner renews her requests for compensation for these fees, she shall document with greater specificity when and how Dr. Hamiel expended her time.

[25] *See* note 21, *supra*.

[26] In her invoice, Dr. Gersh also documents the fees and costs she incurred in *Laughlin*, 13-289V.  Dr. Gersh's Statement at 2, 10.  The *Laughlin* expenses will not be addressed in this decision.

*also* Dr. Gersh's Statement at 5.  Dr. Gersh's most recent expert report was filed on March 12, 2015.

Additionally, Respondent objects to the following: 12 hours of work performed by "non-medical staff," which were not explained; Dr. Gersh's review of medical records in the trailing cases, which had been expressly prohibited by Order; and the time she spent researching causation, which was irrelevant to the onset issue.[27]  Response at 6.

In her Reply, Petitioner argues that Dr. Gersh's work was "reasonable and necessary in order to compliment Dr. Hamiel's expert testimony."  Reply at 3.  "[T]he amounts charged by Dr. Gersh are competitive, and possibly even low, for the area where she practices, Southern California."  *Id*.  Regarding Dr. Gersh's understanding of the applicable onset standard, Petitioner states that Dr. Gersh was "up all night" on the first day of the hearing – after the undersigned had explained in detail why the first possible date of diagnosis is not synonymous with the Program's standard for an assessment of the timing of onset – locating articles to supplement her testimony.  *Id*.  Petitioner argues that "both experts … were wise, and it was necessary, to review the records of the other cases that were consolidated under *Culligan*, because the Special Master's hypothetical questions were based off of those fact patterns."  *Id*.  Petitioner explains that the work of "non-medical staff" was necessary to complete tasks that Dr. Gersh would have had to charge much more to do.  *Id*.  Finally, in response to Respondent's contention that Dr. Gersh's opinions are irrelevant and unhelpful, Petitioner argues that Respondent is inappropriately "[w]eighing the credibility and/or persuasive value of testimony in an application for fees."  *Id*.

With respect to Dr. Gersh's hourly rates, the undersigned finds that there has been no justification provided for a $9,500 flat rate for a day of hearing testimony or for a $650 "report preparation rate."  *See* Dr. Gersh's Statement at 5.  In lieu of these rates, the undersigned finds that $500 is a fair and reasonable rate for *all* of the hours that the undersigned ultimately decides to compensate on behalf of Dr. Gersh.  Dr. Gersh's curriculum vitae ("CV") reflects that she graduated from the University of Southern California School of Medicine in 1997, and that she has been in private practice in gynecology and women's health since 1981.  Pet. Ex. 14 at 1.  Her areas of expertise include gynecology and integrative women's care, with areas of special interest including menstrual irregularity, menopausal medicine, and hormone therapy.  *Id*.  Although her CV does not reflect that she has authored any medical journal articles, it does reflect that she has served as an assistant professor of obstetrics/ gynecology at the USC Keck School of Medicine for over twelve years.  *Id*. at 3.  Other experts from California have recently

---

[27] Respondent notes that Dr. Gersh submitted 44 medical literature articles in conjunction with her expert report, "the vast majority of which dealt with vaccine safety and autoimmune conditions, and only a handful of which addressed the symptoms of POF."  Response at 6.

been compensated by the Program at comparable, if not slightly lower, rates.  *See Brown v. Sec'y of Health & Human Servs.*, No. 09-426V, 2012 WL 952268, at *11 (Fed. Cl. Spec. Mstr. Feb. 29, 2012) (awarding Dr. Lawrence Steinman, a neurologist based in Stanford, California, $450-$500 per hour); *Allen v. Sec'y of Health & Human Servs.*, No. 11-51V, 2013 WL 5229796, at *2 (Fed. Cl. Spec. Mstr. Aug. 23, 2013) (pre-approving Dr. Steinman's $500 hourly rate).

Moreover, the undersigned finds that the number of hours expended by Dr. Gersh is not reasonable.  The undersigned is again unconvinced by Petitioner's justifications for her experts' pre-hearing review of the medical records in the trailing cases.  As noted above, the parties specifically agreed, and the undersigned ordered, that the experts were to consider only abbreviated versions of the facts of the trailing cases.  Order, filed Nov. 24, 2014, at 1-2; Joint Status Report, filed Jan. 20, 2015.  Among other things, this Order was intended to preserve the Program resources that might have been used to pay for the expense of reviewing such a large number of records.  Petitioner is now asking the Program to compensate her for costs that were not only unnecessary, but specifically precluded.[28]  The time spent by Petitioner's experts on this project was redundant because Petitioner's counsel and his staff had already drafted and filed medical record summaries in all of the POF cases.  *See* Pet. Exs. 9-12.

Moreover, the undersigned agrees with Respondent that Dr. Gersh's report and testimony were limited in their "useful[ness] in deciding the issues before the Court."  Response at 7.  In her report, Dr. Gersh opined that "[t]he very notion that one can precisely label the moment when POI symptoms begin is unconscionable, in most cases."  Pet. Ex. 13 at 5-6.  Indeed, instead of identifying an onset symptom, Dr. Gersh "repeatedly discussed the irrelevant question of what symptoms are necessary for a definitive diagnosis of POF."  Response at 7; *see also* Pet. Ex. 13 at 4-8.  She testified at the hearing that she had misunderstood the relevant law, and that she therefore "did not review certain things because it didn't seem significant to [her];" "[b]ecause [she] had focused so much on causation as [her] role in the case and misunderstood the statute, [she] didn't do as much work as [she] would have if [she] had understood it exactly as it is …. [She] had not really done [her] homework at looking at it."  Tr. 258-61.

The undersigned will, however, compensate Petitioner for twelve hours of "other services by non-MD staff" at the requested rate of $95 per hour.  The level of detail provided regarding the nature of these services is wholly inadequate, but the undersigned will assume that Dr. Gersh utilized these services to obtain additional medical literature articles in advance of the hearing.[29]

---

[28] As noted in note 24, *supra*, Petitioner is free to renew her request for compensation to the extent that the hours expended by Dr. Gersh are relevant to causation rather than onset.  In the event that Petitioner refiles her request for compensation at a later time, she shall provide additional documentation regarding the tasks performed.

[29] Dr. Gersh's billing statement reflects that these services were performed on April 15, 2015 and June 2, 2015.  The onset hearing was held on June 15 and 16, 2015.

In accordance with the foregoing, and based on the number of pre-hearing preparation hours awarded on behalf of Dr. Hamiel, the undersigned will compensate Petitioner for 40 hours of Dr. Gersh's pre-hearing preparation.  Additionally, the undersigned will compensate Petitioner for two of the hours spent by Dr. Gersh researching additional medical literature on the first night of the hearing.[30]  All of Dr. Gersh's hours (except for those billed by "non-MD staff") will be compensated at a rate of $500 per hour.  Of the $63,040 billed for her fees, therefore, the undersigned deducts $32,900.[31]

The undersigned will compensate Petitioner for the total amount of costs billed by Dr. Gersh, except that she will be compensated for hours spent traveling at one-half of her regular rate. Of the $5,301.29 billed for her costs, the undersigned deducts $800.[32]

### III.  CONCLUSION

The following table documents the reductions noted above:

| Total Amount of Attorneys' Fees and Costs Requested | $ 186,350.45 |
|---|---|
| Reduction in compensation for one airline ticket | $ 813.20 |
| Reduction in compensation for fees incurred by Dr. Hamiel | $ 2,400.00 |
| Reduction in compensation for fees incurred by Dr. Gersh | $ 32,900.00 |
| Reduction in compensation for costs incurred by Dr. Gersh | $ 800.00 |
| **Total Attorneys' Fees and Costs Awarded** | **$ 149,437.25** |

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[33]

---

[30] The undersigned is aware, based on the testimony given at hearing and on the date of submission of the additional medical literature abstracts, that Dr. Gersh spent time researching medical literature on June 15, 2015, the first day of the hearing.  Dr. Gersh's billing statement does not document that any additional fees were incurred on June 15th, but does document that she spent four hours "research[ing] additional articles for Hearing" on June 14, 2015.  Dr. Gersh's Statement at 5.

[31] The amount billed ($63,040) – the amount awarded ($8,000 for 2 days of hearing + $20,000 for 40 hours pre-hearing preparation + $1,000 researching additional articles + $1,140 in fees incurred by non-medical staff = $30,140) = $32,900.

[32] Dr. Gersh billed for 16 hours of travel time at $300 per hour.  (16 hours at $300 per hour) – (16 hours at $250 per hour) = a total reduction of $800.

[33] Pursuant to Vaccine Rule 11(a), the parties can expedite entry of judgment by each party filing a notice renouncing the right to seek review by a United States Court of Federal Claims judge.

/s/ Lisa Hamilton-Fieldman
Lisa Hamilton-Fieldman
Special Master